```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-16-13
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
J&R ELECTRONICS INC.,

                              Plaintiff,                  12 Civ. 7497 (PKC)

        -against-                                MEMORANDUM
                                                             AND ORDER

BUSINESS & DECISION NORTH AMERICA,
INC., et al.,

                              Defendants.
------------------------------------------------------------x
P. KEVIN CASTEL, District Judge

        Plaintiff J&R Electronics Inc. ("J&R"), a New York retailer, brings this action against Business & Decision North America, (PA) Inc. ("B&D PA"), a software consultancy company, and its predecessor, Business & Decision North America Inc. ("B&D"). J&R hired B&D to configure and install software to connect J&R's various pricing, vendor, finance, purchasing, shipping, inventory, returns, warehouse, and retail systems and it asserts that B&D failed to perform in material respects and misrepresented facts which induced it into entering into a $1.8 million agreement. B&D PA now moves to dismiss the Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., asserting that the Amended Complaint fails to state a claim for relief because the contract limited remedies available to J&R in the event of a breach and J&R has failed to adequately allege its other claims. For the reasons discussed herein, the motion is granted in part and denied in part.

BACKGROUND

        For purposes of a Rule 12(b)(6) motion, all nonconclusory factual allegations are accepted as true and reasonable inferences are drawn in favor of the plaintiff as non-movant.

J&R is a New York corporation with its principal place of business in New York. It owns and operates a series of retail stores on Park Row across from New York City Hall. (Am. Comp. ¶¶ 14, 17.) B&D is a Delaware corporation, with its principal place of business in Wayne, Pennsylvania. (Id. ¶ 15.) B&D PA is a Pennsylvania corporation, with its principal place of business in Wayne, Pennsylvania. (Id. ¶ 16.)

J&R uses software programs for various functions, including to help it determine competitive pricing. (Id. ¶ 20.) In order to "maximize cost transparency, J&R's finance, purchasing, sales, shipping, pricing, inventory, returns, warehouse, and retail systems must be connected." (Id.) J&R's software had evolved piecemeal and therefore was not sufficiently interconnected, resulting in inaccurate reporting and increased cost per sale for J&R's products. (Id. ¶ 21.) J&R's in-house team of programmers did not have sufficient expertise to design or implement a customized Enterprise Resource Planning ("ERP") solution. (Id. ¶ 24.)

In 2010, J&R decided to integrate its systems by implementing an ERP software program. (Id. ¶¶ 1, 22.) The industry practice for businesses like J&R is to engage a consultant to configure and customize an ERP solution. (Id. ¶ 24.) Consultants maintain relationships with software manufacturers and may have manufacturer-issued credentials to implement software packages. (Id.)

J&R assessed a number of ERP software packages and consultants before deciding on a Dynamics AX solution from Microsoft. (Id. ¶¶ 25-26.) B&D, a consulting systems and integration company entered into a Master Services Agreement ("MSA") with J&R on or about February 23, 2010. (Id. ¶ 26.) The scope of the MSA was limited to allow J&R to assess B&D's competency in Dynamics AX and ability to work with J&R. (Id.)

2

Pursuant to the MSA, B&D used space in J&R offices and wrote specifications setting forth technical components necessary to implement the "procure to pay" process, the part of the ERP system that would link J&R's procurement process with its financial department. (Id. ¶ 28.) Upon completion of the work anticipated by the MSA, B&D "assured J&R that [it] had the experience, knowledge, and human capital necessary to undertake the Project," including "a purported expertise in Dynamics AX and a Microsoft 'Gold' certification in enterprise resource planning." (Id. ¶¶ 26, 29.) The parties began negotiations for full implementation of the ERP program. (Id. ¶ 29.)

Dynamics AX 2009 was the then current software release, and Dynamics AX 2012 was scheduled to launch in 2011. (Id. ¶ 30.) J&R was hesitant to build its ERP system with the 2009 version of the software. (Id.) According to J&R, B&D misrepresented that the 2009 software would be able to satisfy J&R's needs and that the 2009 code could be easily transitioned to Dynamics AX 2012. (Id. ¶¶ 31-32.) In particular, B&D represented that Dynamics AX 2009 would meet J&R's Point of Sale ("POS") requirements. (Id. ¶¶ 3, 31.)

J&R licensed the Dynamics AX 2009 ERP software package developed by Microsoft through B&D on or about November 19, 2010 (the "Software Agreement"). (Id. ¶ 35; see also Vetter Decl. Ex. 1 (hereinafter "Software Agreement").) The Software Agreement had a three year term, and required an initial payment of $900,000. (Id. ¶ 35.) The Software Agreement provided that, B&D "d[id] not warrant . . . that the software products or content will meet [J&R's] requirements or will meet [J&R's] expectations or needs." (Software Agreement 5-6.) "Except as otherwise provided in [the] agreement, [B&D] disclaim[ed] all warranties of any kind, express or implied, including, without limitation, implied warranties of merchantability [or] fitness for a particular purpose." (Software Agreement 5.)

3

After approximately a month of negotiation, the parties entered into a Professional Services Agreement ("PSA") on December 21, 2010, and executed a Statement of Work ("SOW") on December 22, 2010 (collectively the "Implementation Agreements"). (Id. ¶ 41.) The SOW was expressly incorporated into the PSA. (Id. ¶¶ 36, 41.) B&D estimated that full implementation would require 8,984 consultant hours at a cost of $1,869,530.41. (Id. ¶ 37.) The Implementation Agreements incorporated these estimates. (Vetter Decl. Ex. 3 ¶ 3.2 (hereinafter the "SOW").) According to J&R, B&D knew or should have known that both the budget and schedule were not realistic. (Id. ¶ 39.)

The Implementation Agreements stated that B&D would provide consulting and implementation services for the Microsoft Software, including specific provisions regarding the scope and objectives of such services. (Id. ¶¶ 42, 43; SOW ¶¶ 1.2, 1.4) The SOW contemplated several phases of the project, and set forth specific deliverables and milestones for each phase. (Id. ¶ 46; SOW ¶¶ 2.4-2.9.) The phases included: (1) Diagnostics; (2) Analysis; (3) Design; (4) Development; (5) Deployment; and (6) Operation. (Id. ¶ 46.) On January 4, 2011, B&D began developing the various Modules, with priority given to the Finance module whose "go-live" date was April 2011. (Id. ¶ 47.) The "go-live" date for the rest of the organization was August 2011. (Id.)

B&D ultimately acknowledged that Dynamics AX 2009 "did not have the necessary functionality" to implement the POS system, and at B&D's request, Microsoft partially funded a customized POS module purporting to meet J&R's requirements to be built on Dynamics AX 2009. (Id. ¶ 51.) The 2012 version of the same software had many of the necessary modules already built in, and thus, was more suitable to J&R's needs. (Id. ¶ 52.)

4

While J&R replied to and substantially complied with all of B&D's requests (Id. ¶ 53), B&D's performance fell off-pace. (Id. ¶¶ 54-56.) The project "stalled completely" in the Development phase. (Id. ¶ 57.) The Deployment and Operations phases never began. (Id. ¶ 58.) Although B&D fell behind schedule, it assured J&R that the ERP system would be timely completed. (Id. ¶ 59.)

After Dynamics AX 2012 was released in August 2011, Microsoft "locked down" the Dynamics AX 2009 business layer code. (Id. ¶ 63.) Accordingly, the project could not be completed using the 2009 software. (Id.) The Finance module, which B&D had completed on the 2009 software, was useless because it remained disconnected from the rest of J&R's systems. (Id.) According to Microsoft, translating the Dynamics AX 2009 code into Dynamics AX 2012 would be more expensive than restarting the Project in its entirety with Dynamics AX 2012. (Id. ¶ 64.)

It was "virtually impossible" for J&R to determine the Project's actual status as compared to the schedule. (Id. ¶ 65.) In July 2011, one month prior to the completion date specified in the SOW, B&D finally estimated that the key deliverables of the Project would be completed by November 2011 for an additional $300,000. (Id. ¶ 67.) In October 2011, B&D pushed back the go-live date again to March 2012 and informed J&R that the project would cost an additional $697,843. (Id. ¶ 68.) B&D's explanation for why the project was now 40% over budget was only that it underestimated its complexity. (Id.) At that time, B&D would not confirm the March 2012 go-live date, or provide a new date. (Id. ¶ 69.)

J&R alleges that had B&D informed it that the project was off-track and off-budget earlier, it would not have authorized B&D to continue working on the project and would not have continued to pay B&D fees. (Id. ¶ 70.) Instead, J&R paid B&D over $1.8 million –

5

"the equivalent of the entire estimated Project budget, even though the Project was nowhere near finished." (Id.) Microsoft advised J&R to discard the incomplete Dynamics AX 2009 code and start over with Dynamics AX 2012. (Id. ¶ 72.) Further, completing the project is no longer feasible because Microsoft has locked down of the code for Dynamics AX 2009. (Id.)

The PSA provides that, if B&D's services did not conform to the Implementation Agreements, "B&D's sole obligation and Client's sole and exclusive remedy will be for B&D to correct [the] non-conformance at absolutely no fee, charge or expense." (Id. ¶ 73; PSA ¶ 8(a), (b).) While the Software Agreement and PSA contemplate using Dynamics AX 2009, Microsoft has informed J&R that it is not feasible to complete the project with that version of the software. (Id. ¶ 75.) Moreover, B&D is no longer a Microsoft "Gold Certified" partner for Dynamics AX, and has lost the human capital necessary to operate its Dynamics AX consultancy business. (Id. ¶ 76.) As a result, J&R alleges that B&D is unable to correct the non-conformance. (Id.)

B&D merged into B&D PA in December 2010. (Id. ¶ 78.) The PSA's anti-assignment clause prohibits B&D from assigning the PSA or rights, obligations or benefits thereunder. (Id. ¶ 79.) J&R alleges that B&D's merger into B&D PA is an impermissible assignment "by operation of law," and therefore, is a material breach of the PSA. (Id. ¶¶ 80-81.)

Moreover, in or around July 2012, B&D PA, the surviving entity to the merger, "exited" the Dynamics AX market by selling its Dynamics AX business to AKA Enterprise Solutions, Inc. d/b/a InterDyn AKA ("InterDyn"). (Id. ¶¶ 9, 83.) InterDyn is separate from and unrelated to B&D as well as B&D PA. (Id. ¶ 84.) Upon the sale to InterDyn, B&D lost "substantially all" employees with expertise in Dynamics AX.[1] (Id. ¶ 86.) According to J&R, B&D PA will assign the PSA to another Dynamics AX consultant, because B&D PA wants to

---

[1] J&R alleges that B&D's priority was to "use" J&R to facilitate this sale to InterDyn, not to complete the project. (Id. ¶ 85.) For instance, B&D assigned employees unfamiliar with Dynamics AX and J&R's specific requirements to the project. (Id. ¶ 48.) B&D used the "goodwill associated with J&R's brand" to facilitate the sale. (Id. ¶ 4.)

6

utilize the limited remedy provision in the PSA. (Id. ¶ 87.) J&R could not control such a third-party assignee or vet for experience and expertise. (Id. ¶ 88.)

The Amended Complaint asserts four causes of action. J&R claims that B&D breached the PSA by (i) failing to provide J&R with "services" in accordance with the SOW; (ii) failing to complete the Project; (iii) failing to provide deliverables that conformed with the project plan; and (iv) violating the non-assignment clause. (Id. ¶ 93.) Further, J&R claims that B&D negligently misrepresented to J&R that (i) Dynamics AX 2009 would meet its requirements and could be easily transitioned to Dynamics AX 2012; and (ii) the project would be completed by August 2011 and would cost $1,869,530.41. (Id. ¶ 101.) The third cause of action asserts a claim for declaratory relief that "B&D's assignment to B&D PA of the PSA or any delegation or subcontract of any rights, obligations, or benefits under the PSA is void and invalid." (Id. ¶ 113.) In the alternative, J&R seeks injunctive relief, enjoining B&D PA from assigning, delegating or contracting its rights, obligations or benefits under the PSA. (Id. ¶ 116.) J&R also seeks attorneys' fees and costs (Id. at 28.)

STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The "factual content" offered must "allow[ ] the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Id. Accordingly, "the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.; see also Twombly, 550 U.S. at 555. In

assessing a complaint, courts draw all reasonable inferences in favor of the non-movant. See In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).

"[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." Id. (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)). The Software Agreement, the PSA, and the SOW, which B&D PA annexed to the Vetter Declaration (Docket No. 15; 18) are each integral to the Amended Complaint, and thus, may be considered on this motion.

DISCUSSION

1. Breach of Contract

J&R alleges that B&D materially breached its obligations under the PSA by, *inter alia*, failing to deliver a fully implemented ERP system, thereby damaging J&R in an amount in excess of $5 million. (Am. Compl. ¶¶ 93, 95.) B&D PA does not dispute that J&R has pled the requisite elements for a breach of contract claim. The PSA, however, contains a limited remedies provision, which states that:

> B&D's sole obligation and Client's sole and exclusive remedy [for
> failure to provide satisfactory services], will be for B&D to correct

8

such non conformance at absolutely no fee, charge or expense.

(PSA ¶ 8(a), (b).) Accordingly, B&D PA asserts that J&R may not recover damages as a matter of law due to the contractual remedies limitation, which limits J&R's remedies to specific performance.

Under New York law,[2] contractual remedies and damages limitations are enforceable, unless certain exceptions apply. Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 553 (1992); Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C., 270 A.D.2d 325, 325 (2d Dep't 2000); Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 192 A.D.2d 83, 88-89 (1st Dep't 1993). While J&R does not contest that limited remedies provisions are generally enforceable, it asserts that the limited remedies provision in the PSA is not enforceable in this particular case because (1) B&D waived this contractual protection; and (2) the limited remedy fails of its essential purpose.

A. Waiver

J&R asserts that B&D PA waived any purported right to limit its damages to specific performance of the contract by selling its Dynamics AX practice and terminating its Dynamics AX employees, rendering it unable to complete the project. "Generally and excepting instances where there would be transgressions of public policy, all rights and privileges to which one is legally entitled, ex contractu or ex debito justitiae, may be waived. A waiver, the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage." Hadden v. Consol. Edison Co. of N.Y., 45 N.Y.2d 466, 469 (1978) (internal citations omitted). "However, waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection." Fundamental Portfolio Advisors, Inc. v.

---

[2] The PSA, by its terms, is governed by New York law. (PSA ¶ 17.) The parties do not dispute that New York law also governs the tort claim.

9

Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 104 (2006) (internal citations and quotations omitted). "[F]or conduct to amount to a waiver . . . it 'must not otherwise be compatible with the agreement as written;' rather, 'the conduct of the parties [must] evidence [ ] an indisputable mutual departure from the written agreement.'" Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003) (quoting Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 344 (1977)). "Generally, the existence of an intent to forgo [] a [contractual] right is a question of fact." Fundamental Portfolio Advisors, 7 N.Y.3d at 104; Travelers Cas. & Sur. Co. v. Dormitory Authority-State of New York, 735 F. Supp. 2d 42, 66 (S.D.N.Y. 2010) (Cote, J.).

J&R has plausibly alleged that B&D waived the limited remedies provision by eliminating its Dynamics AX practice. B&D PA "exited" the Dynamics AX market in 2012 when it sold its Dynamics AX business to InterDyn. (Am. Comp. ¶ 83.) Upon the sale to InterDyn, B&D also lost "substantially all" employees with expertise in Dynamics AX. (Id. ¶ 86.) B&D's loss of its "Gold Certification" from Microsoft means that it will not be able to access Microsoft consultants and experts, further impeding B&D's performance. B&D PA asserts that the alleged conduct is fully consistent with the PSA, which expressly anticipates the hiring and departure of B&D employees. (PSA ¶ 2(c).) While change in personnel over time may be consistent with the PSA, sale of the entire Dynamics AX practice is arguably inconsistent.

> The PSA contains a no waiver clause, which states, in pertinent part:
>
> This document . . . constitute[s] the entire agreement between the Parties . . . . This Agreement may not be amended or discharged except by a writing signed by duly authorized representatives . . . . Waiver of any provision hereof in one instance shall not preclude enforcement thereof on future occasions. The covenants, conditions, terms and provisions of this Agreement <u>may not be waived or modified orally</u> and shall supersede all previous proposals, both oral and written negotiations, representations,

10

>commitments, writings or agreements or any other
>communications between the Parties.

(PSA ¶ 22(a).) Thus, the PSA provides that terms of the Agreement cannot be waived orally, but does not explicitly require that such waiver be in writing.[3] The PSA's "no waiver" provision thus does not speak to whether the provisions may be waived by the parties' conduct. The provision of an agreement prohibiting waiver does not necessarily preclude the waiver of a contractual clause. E.g., Dice v. Inwood Hills Condominium, 237 A.D.2d 403 (2d Dep't 1997) (no waiver clause in condominium bylaws does not preclude waiver of right to enforce rules and regulations); TSS-Seedman's Inc. v. Elota Realty Co., 72 N.Y.2d 1024, 1027 (1988) (acceptance of rent waived default in leases despite "nonwaiver" clause). The Court concludes that J&R has plausibly alleged that B&D PA has waived its purported right to limit its damages under the PSA, and thus, the motion to dismiss the breach of contract claim is denied.

2. Negligent Misrepresentation

J&R alleges that B&D negligently misrepresented that (a) Dynamics AX 2009 would meet J&R's business requirements and (b) the project would be completed by August 2011 and would cost $1,869,530.41. (Am. Compl. ¶ 101.)

Under New York law, in order to state a claim for negligent misrepresentation, a plaintiff must allege, "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."[4] Mandarin Trading Ltd. v.

---

[3] Agreements that expressly require a waiver to be in writing are enforceable. (See Maxim Group LLC v. Life Partners Holdings Inc., 690 F. Supp. 2d 293, 301 n.3 (S.D.N.Y. 2010) (Preska, J.) (noting "because the Agreement expressly provided that "any waiver must be in writing" oral response could not be construed as waiver); ZBD Constructors, Inc. v. Billings Generation Inc., 2011 WL 1327144 (S.D.N.Y. March 25, 2011) (waiver must have been in writing where no waiver clause states "none of the terms or provisions of this Agreement may be . . . waived . . . except by an instrument in writing") (Buchwald, J.)).

[4] The Second Circuit has not explicitly ruled on whether Rule 9(b), Fed. R. Civ. P. applies to New York negligent misrepresentation claims. See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168,

11

Wildenstein, 16 N.Y.3d 173, 180 (2011) (citation omitted). See also Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000). "The tort of negligent misrepresentation cannot be independently asserted within the context of a breach of contract action unless . . . the alleged misrepresentation concerns a matter which is extraneous to the contract itself." Alamo Contract Builders, Inc. v. CTF Hotel Co., 242 A.D.2d 643, 644 (2d Dep't 1997) (citation omitted). "In determining whether justifiable reliance exists in a particular case, a fact finder should consider whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." Kimmell v. Schaefer, 89 N.Y.2d 257, 264 (1996). B&D PA asserts that J&R has failed to adequately allege the special relationship and reliance elements. Moreover, it asserts that these allegations are subsumed within J&R's breach of contract claim.

A. Existence of a Special Relationship

"[L]iability for negligent misrepresentation has been imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Kimmel, 89 N.Y. 2d at 263. A special relationship may arise when a person "wholly without knowledge seek[s] assurances from one with exclusive knowledge." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 189 (2d Cir. 2004) (quoting Heard v. City of New York, 82 N.Y.2d 66, 75 (1993)). The Second Circuit "has held that a 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for

---

188 (2d Cir. 2004); Ebusinessware, Inc. v. Technology Services Group, 2009 WL 5179535, at *13 (S.D.N.Y. 2009) (Castel, J.) (acknowledging that the Second Circuit has left open the question of whether Rule 9(b) applies to negligent misrepresentation claims). Because the defendant has not raised Rule 9(b), the Court addresses plaintiff's negligent misrepresentation claims under Rule 8(a), Fed. R. Civ. P.

negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in *Kimmel*." Id. at 188 (internal citation omitted).

While a close question, J&R has pled sufficient facts at the pleading stage to plausibly allege a special relationship. Compare Sogeti USA LLC v. Whirlwind Bldg. Sys, Inc., 274 Fed. App'x 105, 108 (2d Cir. 2008), and Fresh Direct v. Blue Martini Software, Inc., 7 A.D.3d 487, 488 (2d Dep't 2004), with Atkins Nutritionals v. Ernst & Young, 301 A.D.2d 547, 548-49 (2d Dep't 2003), and Bell Sports, Inc. v. System Software Assocs., Inc., 45 F. Supp. 2d 220, 229 (E.D.N.Y. 1999). J&R engaged in extensive due diligence, assessing numerous ERP software packages and consultants, before ultimately deciding that Dynamics AX best fit its needs. (Am. Compl. ¶¶ 25-26.) J&R admits it has an in-house team of programmers, but states that it did not have the necessary expertise to design or implement an ERP solution. (Id. ¶¶ 21, 23-24.) B&D assessed J&R's software needs for nine months before signing the Software Agreement. (Id. ¶¶ 26-31, 35, 97-98.) Moreover, B&D possessed specialized expertise concerning ERP solutions and the Dynamics AX software. (Id. ¶ 27.) "Whether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact." Kimmel, 89 N.Y. at 264. With a full factual record, the issue of a special relationship may be ripe at the summary judgment stage.

B. Reasonable Reliance

A plaintiff may reasonably rely on representations regarding present facts, but not representations that are promissory in nature or relating to future events. Hydro Investors, 227 F.3d at 20-21. "[T]he 'present fact' exception draws its vigor not from the nature of the misrepresentation in a vacuum, but from the fact that such a misrepresentation wrongfully

13

induced the other party to enter the contract." Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 429 (S.D.N.Y. 2004) (Hellerstein, J). Where a plaintiff has the capacity to conduct due diligence, the defendant is not imparting exclusive information, and plaintiff exhibits familiarity with the hazards inherent to the transaction, a relationship sufficiently special to justify reliance is unlikely to arise. Eternity Global, 375 F.3d at 189.

J&R alleges that B&D negligently misrepresented that: (a) Dynamics AX 2009 would meet J&R's requirements and could be transitioned to Dynamics AX 2012; and (b) the project would be completed by a certain date at a certain cost. (Am. Compl. ¶ 101.) J&R's brief in opposition does not argue that it reasonably relied on the latter alleged misrepresentation, and the claim may be dismissed on this basis alone. Hanig v. Yorktown Cent. Sch. Dist., 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) (Conner, J.) ("[B]ecause plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed."). In any case, J&R has not plausibly alleged that it relied on the time and cost estimates provided by B&D. First, the Implementation Agreements specifically warned that the estimates would likely need to be revised. (E.g., PSA ¶ 2(a); SOW ¶ 1.4.1, id. ¶ 5.10; Am. Compl. ¶ 25, id. ¶ 23.) Moreover, any such estimates provided to J&R related to future events. J&R could not have reasonably relied on such representations.

J&R argues that it reasonably relied on the representations that Dynamics AX 2009 would fulfill its business needs. Pursuant to the Software Agreement J&R accepted the Microsoft Software "AS IS" and "AS AVAILABLE." (Am. Compl. ¶ 101(a); Software Agreement at 5.) Further, the Software Agreement stated that "B&D expressly D[ID] NOT WARRANT . . . THAT THE SOFTWARE PRODUCTS OR CONTENT WILL MEET [J&R'S] REQUIREMENTS OR WILL MEET [J&R'S] EXPECTATIONS OR NEEDS." (Software

14

Agreement at 5-6.) J&R asserts that even specific disclaimers as to reliance on those representations do not bar its negligent misrepresentation claim because the oral misrepresentations made by B&D were peculiarly within its knowledge. "[T]he peculiar knowledge exception is designed to address circumstances where a party would face high costs in determining the truth or falsity of an oral representation, and those costs are sufficiently great to render reliance upon the representation reasonable." Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co., 149 F.3d 134, 136 (2d Cir. 1998) (citation omitted). The peculiar knowledge exception may apply to a claim for negligent misrepresentation. See Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 340 (S.D.N.Y. 2005) (Pauley, J.). J&R alleged that although B&D was not the manufacturer or licensor of the software, B&D had knowledge of the software's functionality which was unavailable to J&R, and represented that the software would be able to meet J&R's requirements. (Am. Compl. ¶¶ 27, 29, 31.) The Court concludes the Amended Complaint plausibly alleges J&R's reliance on B&D's representations regarding the functionality of the software.

C. Duplicative of Breach of Contract Claim

J&R's claim for negligent misrepresentation succeeds in part and fails in part because certain claims are duplicative of the breach of contract claim. "[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although they may be connected with and dependent upon the contract." Id.

"As a general rule, New York courts preclude [fraud and misrepresentation] actions where the only fraud charged relates to a breach of contract. Such a relationship exists

15

where the fraud claims do not allege facts extraneous and collateral to the contract. R.H. Damon & Co., Inc. v. Softkey Software Prods., Inc., 811 F. Supp. 986, 992 (S.D.N.Y. 1993) (Duffy, J.) (internal citations and quotations omitted); cf. Gruntal & Co., Inc. v. San Diego Bancorp, 901 F. Supp. 607, 616 n.6 (S.D.N.Y. 1995) (distinguishing R.H Damon & Co.) (Chin, J.). To determine whether plaintiff has alleged facts extraneous or collateral to the contract, the Court may consider whether the Amended Complaint has alleged damages in addition to the damages for the breach. R.H. Damon & Co., 811 F. Supp. at 992.

J&R alleges that to induce J&R to purchase Dynamics AX 2009, B&D misrepresented that (1) Dynamics AX 2009 would be able to meet J&R's requirements, and (2) Dynamics AX 2009 could easily be transferred to Dynamics AX 2012. J&R also alleges that at the time of that representation, B&D knew or should have known that Dynamics AX 2009 could not fulfill J&R's needs and that it could not be easily transferred to Dynamics AX 2012. (Am. Compl. ¶¶ 31, 32, 34.) The Software Agreement provides for the POS functionality. (Software Agreement 2). Therefore, any negligent representations as to the POS function were part of the express terms of the contract. Accordingly, J&R does not adequately allege an independent tort claim regarding the POS functionality.

However, J&R's allegation that B&D negligently misrepresented that Dynamics AX 2009 could be easily transferred to Dynamics AX 2012 is not duplicative of its breach of contract claim. J&R alleges that it was induced to purchase Dynamics AX 2009 in part because B&D represented that Dynamics AX 2009 could be easily transferred to Dynamics AX 2012. Liberally construed, J&R's allegation that B&D misrepresented a present fact regarding the product's capabilities, which induced J&R to enter into the contract, properly states a claim for relief based on negligent misrepresentation. Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324,

342 (S.D.N.Y. 2005) (Pauley, J.). For this reason, the motion to dismiss the Second Cause of Action of the Amended Complaint is denied in part and granted in part.

3. Declaratory Relief

The PSA's anti-assignment clause "prohibits B&D from assigning the PSA or delegating or subcontracting 'any rights, obligations, or benefits under this [PSA] without prior written consent.'" (Am. Compl. ¶ 79 (citing PSA ¶ 18).) The PSA further provides that "no other party 'shall be considered a beneficiary of this Agreement or entitled to any rights under this Agreement." (Id. (citing PSA ¶ 18.))

J&R alleges that B&D's merger into B&D PA is an assignment by operation of law, which constitutes a breach of the PSA's anti-assignment provision and requests declaratory relief. (Am. Compl. ¶¶ 110-15.)

Under New York law, merger of a subsidiary into a parent does not necessarily constitute an improper assignment. Brentsun Realty Corp. v. D'Urso Supermarkets, Inc., 182 A.D.2d 604, 605 (2d Dep't 1992). An improper assignment may occur if there is a change in the "beneficial ownership, possession, or control" of corporate property. Id. The Amended Complaint does not contain any nonconclusory factual allegations indicating a change in the beneficial ownership, possession, or control of corporate property. Thus, the Third Cause of Action of the Amended Complaint is dismissed.

4. Injunctive Relief

J&R also seeks injunctive relief prohibiting B&D PA from assigning the PSA to a third party. (Am. Compl. ¶¶ 114-19.) In 2012, B&D PA sold its Dynamics AX practice to InterDyn. (Am. Compl. ¶ 83.) J&R alleges that because B&D PA lacks the human capital necessary to complete the project, assignment of the contract is imminent, and seeks injunctive

relief preventing assignment of the PSA. To obtain a permanent injunction, "a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006) (internal quotation marks and citation omitted). "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir.1995) (internal quotation marks omitted).

J&R alleges that it will be irreparably harmed if B&D PA assigns the contract outright because it will not be able to vet the experience and expertise of the assignee. (Am. Compl. ¶¶ 114-19.) The Amended Complaint does not state facts indicating that money damages would be inadequate compensation. For this reason, the Fourth Cause of Action in the Amended Complaint is dismissed.

5. Attorneys' Fees

The Amended Complaint requests "reasonable attorney's fees." Under New York law, parties to a litigation bear their own attorneys' fees absent a statutory or contractual fee shifting provision. 214 Wall St. Assocs., LLC v. Med. Arts-Huntington Realty, 99 A.D.3d 988 (2d Dep't 2012). Under the "American Rule," attorneys' fees are not "recoverable in the absence of a statute or enforceable contract providing therefor." U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 74 (2d Cir. 2004). The Software Agreement provides that "if any action is necessary to enforce or interpret the terms of this agreement, the prevailing party shall be entitled to reasonable attorneys' fees . . . ," (Software Agreement 6). Accordingly, the claim for attorneys' fees stands pending the outcome of the underlying dispute.

18

## CONCLUSION

For the reasons stated herein, the motion (Docket No. 13) to dismiss is granted in part and denied in part. The motion is denied as to the First Cause of Action for breach of contract and the Second Cause of Action for negligent misrepresentation, only insofar as that claim relates to B&D's statement that Dynamics AX 2009 could easily be transferred to Dynamics AX 2012. The motion is granted as to the Second Cause of Action relating to J&R's other negligent misrepresentation claims, the Third Cause of Action for declarative relief, and the Fourth Cause of Action for injunctive relief.

SO ORDERED.

*[signature]*

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 16, 2013